Thank you, and may it please the Court, Adam Hausmann Henner, again, of McDonnell-Coronado. With your permission, I'd like to reserve three minutes of my time for rebuttal. In 2013, the Meylings purchased the assets of Metalast International, LLC, and since then have tried to build and save a business that at the time couldn't make payroll, was languishing under millions of dollars of debt, and had become insolvent. Despite purchasing all of the assets and goodwill of that business, the next decade has seen a systematic campaign through the courts and otherwise to devalue and lessen the benefit of the bargain for the Meylings through the adversarial bankruptcy proceeding, through this action involving the dispute over trademarks, and through the sideshow of these class action investor lawsuits as well. And so this current action is layered on top of that state court receivership action and layered then on top of the adversarial bankruptcy proceeding at which a settlement agreement was reached. While the Meylings have prevailed on several important claims at the bench trial below, there are several issues that we believe that the district court made clear as of law and we'd like to address today. The three that I'd like to focus on first are the district court's conclusion that Kimyon did not have standing to cancel one of Apelli's trademarks because it couldn't show harm to its own marks. The second is that the settlement agreement constituted an absolute ban on the use of the word MEDLAST. And the third, that the threatened use of common law marks was insufficient to support a permanent injunction, as the district court found that only actual use in commerce was sufficient to warrant that injunction. I'd like to start with the Lexmark decision. And to be clear, I believe that the result in this case was erroneous whether the district court applied the Starkist analysis or the Lexmark decision. I read the Lexmark decision as essentially representing two trends. The first is that district courts should resolve cases on their merits without declining to hear them on standing grounds. And the second, that courts should not impose or graft prudential requirements onto Lanham Act claims when that requirement isn't found in the plain language of the statutes. We believe that the Lexmark decision supports a finding that Kimeon did have standing to cancel the trademarks because the finding of the district court's conclusion was that Kimeon lacked standing because it could not show harm to its own marks. That's contrary to the plain language of the Lanham Act, which doesn't permit all factually injured plaintiffs to recover, but does permit a petition to cancel a registration of a mark that can be filed by any person who believes that he is or will be damaged, not necessarily someone whose own marks have been damaged. So assuming we agree with you on that, what's the remedy? Just to send it back to have the district judge do a proper analysis of the scope of standing under the Lanham Act? Under either the Lexmark or Starkist, we would agree. This was an issue that was resolved at the summary judgment phase before it reached trial, and it was resolved relatively early, although late in the history of this case, by the district court, and only on that ground. So the remedy would be to remand to the district court to reverse that grant of summary judgment and to allow Kimeon the ability to continue to pursue its claim for trademark cancellation. That was not quite what I asked. Not to remand in order to allow Kimeon to go forward, but rather to remand to allow the district court to perform an analysis proper under Lexmark to see whether Kimeon has standing. Yes, Your Honor, I would agree with that. And the reason for that is because the district court reached it on erroneous grounds. I agree with you. I think the district court had its scenario. I can't speak for my colleagues. Well, if either of them have a question, I'd be happy to answer that as well. I'm curious, under a Lexmark analysis, what would your damages be? How would you articulate your damages? So if we're moving on to the second prong of the Lexmark analysis about the proximate cause, our damages, we think, could be illustrated through a variety of different means. And the first is the threat of litigation. And the Eleventh Circuit's case we cited, Royal Palms, says that essentially having someone out there threatening to use a trademark to continuously bury you in litigation is a sufficient harm. So that alone, which is actually the case here, is something that we think we could show actual harm to the business of Kimeon. Not only that, the damage to goodwill is very important here. What the basis of this common law trademark claim is really about is there was a trademark filing where Medelast and David Simas not only represented that they had the ability to use the Medelast wordmark, which, again, is part of the settlement agreement that I'll get to. But in doing so, they represented that they had the license from the U.S. Navy, a patent license from the U.S. Navy, to manufacture this product. That's false. And they represented that they were using, in commerce, AA-200 and TCP-HF. I believe the trademark filing may have just been about TCP-HF. But those are all harms to Kimeon's goodwill, to reputation, and not necessarily the imminent diversion of sales, which would be the paradigmatic example of harm under the Land Act, but certainly the threat of litigation, the damage to the goodwill, and the representation to the marketplace in general that this product can be obtained elsewhere, when, in fact, it cannot. Can I ask about Starkist? So your argument is that Starkist doesn't actually hold that you have to own your own mark. That's just a misinterpretation of the opinion? Yes, Your Honor. It talks about owning your own mark because those were the damages to owning, in that case, about owning your own mark. But it really talked about a real commercial interest and talking about whether someone is an intermeddler, an interloper to the proceeding, and not necessarily that the harm could only be construed as coming to your own marks. And specifically in Starkist, there was a representation made by the party that they owned the true patent in the Philippines. And in that case, they found that because that was untrue, that harmed the other party, Starkist in this case, because there was a representation made to the marketplace that was false about the ownership of this trademark. Similarly here, the representation is made by Siemens and Medlast, whatever the name of that company happens to be at the time. If the representation is made that they have the ability to make these products under the Navy patent license, then that's a harm to the general marketplace and to the reputation and goodwill of Chimeon. And that, again, raises the question of what exactly did Chimeon purchase? If this was something that the former owner of Medlast was going to continue to directly compete, use that same goodwill, contact the distributors. Representations were actually made directly to the distributors, saying we're going to continue to sell this product. On cancellation, I do want to address the issue that was raised for the first time appeal about whether it's a standalone claim. I do read Ayers Aromatics as more of a jurisdictional case where that doesn't provide an independent basis for federal jurisdiction rather than a decision that would prevent that claim from being brought in an already existing trademark proceeding. But even if that reading is incorrect, there are still plenty of other claims that demonstrate that this is an action regarding a registered trademark and regarding common law trademarks as well, which would permit the petition for cancellation to proceed in this civil action. I want to turn to the settlement agreement. Can you talk about the Steppenwolf case and how that applies? Yes, Your Honor. We believe it applies because it's a trademark decision that then the settlement agreement should be interpreted through the lens of the trademark law. Why is that when the settlement agreement doesn't talk about it? The settlement agreement doesn't talk about Steppenwolf, but what the settlement talks about is the use of a mark. And it says to use the name Metalast in any fashion or manner whatsoever. That's pretty broad. Right before that, the provision is that Kimeon will be able to continue to use the disputed mark for 90 days. And then after that very provision in the next sentence, it says that following that 90 days, the mark will be owned by Mr. and Mrs. Simas to be used by whatever entity. That middle language is broad, but this is in the context of years of litigation where a settlement agreement was reached on the record, placed on the record in 15 minutes, and the parties were discussing a mark. The best analogy that I've been able to come up with is a settlement agreement about real property where the settlement agreement provides, we agree that you own the house. And then when the other party comes in and tries to remove their personal property, under the doctrine of real estate law separating fixtures from personal property, the counterparty says, no, no, the settlement agreement says we own the house. And that means we get everything in it. And the other party would have to argue, well, we clearly intended to incorporate concepts of real property law into our settlement agreement because that's what the dispute was about. The same analysis applies here. This is a dispute not about any specific use of the word MEDLAS, but about the ownership of a trademark.  But you knew that that issue was contested in the bankruptcy, and then you still agreed to it. Well, in order for the other side to reach that point, they have to agree that the settlement agreement is ambiguous because then they'd be interpreting that post-settlement agreement in motion practice as essentially parole evidence to then interpret what the parties knew and agreed to in the settlement agreement. And at that point, we believe we can prevail by showing that the settlement agreement and the intent of the parties was not to prevent the use of MEDLAS in any way whatsoever. That's also the result of Chief Judge Due, who held that interpreting in that literal fashion would be an absurd result. But she relied on Steppenwolf to say the parties must have met only in commerce. And it wasn't just only in commerce. It was in a confusing way in commerce. And that's the principle of trademark law we need to incorporate and put into this case. When the parties went to trial, the expectation was that they would discuss consumer confusion. There's not a single example in the record, not a single piece of evidence, that the way the Mylings and Kimeon used the term MEDLAS generated any consumer confusion. So the injunction itself is so overbroad, it specifically applies to safety data sheets. That's what Steppenwolf is about. Can you accurately describe that you were in this band on your resume? Can Kimeon say one of our former names was MEDLAS Surface Technology, which the district court ignored and got wrong, too? Can Kimeon say this product, in response to a customer inquiry, used to be sold under this MEDLAS trade name? If the government and OSHA come in and require the labeling of these products, whether it's a current regulation or a future regulation, could you accurately describe something as a formerly MEDLAS product? What Steppenwolf holds so instructively is the use of the word formerly, which Kimeon used to describe its association or former relationship with MEDLAS, in itself prevents customer confusion or, at the very least, substantially lessens the likelihood of customer confusion by not identifying the product as MEDLAS but as formerly MEDLAS. With that, I'd like to reserve the balance. Can I just ask, even if Steppenwolf applied, it sounds like the district court, after the bench trial, did apply it but said that your use of it is beyond Steppenwolf. We disagree. The district court looked at Steppenwolf and initially, in the very lengthy findings of fact, mentioned Steppenwolf, but when it got to the injunction, never actually applied Steppenwolf in the way it must be, which is based on consumer confusion. And so the district court's injunction isn't, you can't use MEDLAS on a safety data sheet. You can use MEDLAS on a safety data sheet, but not in these contexts, without any evidence of consumer confusion. It said that Kimeon cannot use the MEDLAS term or mark anywhere, ever. No, I said in commerce. So she graphs on the phrase in commerce, but the question then becomes what can a company do regarding MEDLAS that's not in commerce? That's an injunction that's so overbroad, it prevents any possible, any conceivable use of the term MEDLAS. Well, it seems like you could have negotiated for that. I'll address that in a little bit, Your Honor. Good morning. May it please the Court. My name is Michael Hoy. I represent the two appellees in this case, David Simas and MEDLAS International, Inc. I want to begin by pointing out that this case, this appeal, is not legally related to the investor cases, and there's an important reason for that. Certainly David Simas was an investor in MEDLAS International, Inc. He founded the company. He created the name long before these entities were ever formed. His entity, MEDLAS International, Inc., was the manager of MEDLAS International, LLC. The reason David Simas and his entities are not parties to the investor case is precisely because of the settlement agreement that was formed in January of 2015. And the reason that settlement agreement disconnects my clients from the investor cases is because it has a release of all conduct on both sides up to the date that that settlement agreement was confirmed by the bankruptcy court. And those releases had quite a lot to do with the way in which our case was litigated all the way through a bench trial. So let's go back to the settlement agreement itself. Judge Fletcher quoted the key language. At the end of that 90-day period, the appellants will no longer be able to use the name MEDLAS in any fashion or manner whatsoever. And the court, no doubt, has read the transcript of that settlement conference where Settlement Judge Zive swore the parties up. These are sophisticated business parties all represented by very capable business lawyers. Stated what the terms are, canvassed the parties to make sure that they understood what they were agreeing to, and then they put that current litigation to bed. And counsel said something that was incorrect, and I don't fault him because this is a very lengthy and complex trial record and counsel who addressed you earlier was not trial counsel in this case and didn't come on until the appeal. I apologize, I lost my train of thought. Oh, he talked about the settlement as stating that from this day forward, Mr. Simas would own the trademark. But if you go to page 9 of that transcript, and I apologize, I don't have the ER for that, but if you go to page 9, Mr. Simas' counsel stood up and he said, Judge Zive, we want to be clear here, David Simas already owns these trademarks. This is not a transfer of the ownership. He always has owned the registrations for these marks. So these sophisticated parties represented by counsel made a legal bond, and this entire litigation has been an attempt to break that bond. So rather than live with the language to which they agreed, they want this court to rewrite the contract to say, Appellants will not use the name Metal Ask in any way that constitutes a Lanham Act infringement of the Metal Ask word mark. Appellants further reserve the right to assert that the record owner of the mark of the USPTO register, David Simas, does not own, or at least should not own, the trademark registrations. And appellate counsel said something else with respect to the cancellation issue, and I'm going to get to that in more depth, I hope. He said that canceling this Metal Ask registration has everything to do with Chemion's ability to have its own mark and to continue in business. Well, a Metal Ask word mark has nothing to do with the Chemion trade name or Chemion's ability to practice its own trademark. And furthermore, there is not just one Metal Ask word mark registration. There are at least four that I can think of. The cancellation claim relates to a single registration. It's the 296-3106 registration. Well, there are other Metal Ask marks out there that are not under attack. In fact, Chemion's own papers in this case and in the appeal make clear that they're only attacking the single registration. So on the cancellation claim, how could Chemion say, well, if we just cancel the Metal Ask registration under one registration, but we leave these other two or three or four Metal Ask registrations out there, how are they going to show standing under the Lexmark analysis? They can't. One of the other things that has permeated the... I'm sorry, why can't they show standing under Lexmark? I'm sorry? Why can't they show standing under Lexmark? So Lexmark is a consumer confusion test. It's an infringement test. The test to show the zone of interest for cancellation is quite different. And, in fact, Judge Due really, without knowing it, applied Lexmark in the sense that she said the zone of interest is, what will be the harm to the cancellation petitioner's own mark if I allow this one Metal Ask registration to stand? And that's the same thing as in... That's quite what Judge Due said. You don't have your own mark, so, therefore, you can't even get in the door. Judge Due said, to establish standing as a cancellation petitioner, Cameon must show a real and rational basis for its belief that it would be damaged by the registration sought to be canceled stemming from an actual commercial or pecuniary interest in its own mark. Correct. So... So it's its own mark is the erroneous part. If she cut it off that, you know, pecuniary interest, I think that's correct. But when she added in its own mark, I think that violates Lexmark. Except that, Your Honor, the Lexmark decision talks about standing with respect to consumer confusion or false advertising, false designation of origin. And this case is different in the sense that there is no way that the Metal Ask mark could confuse consumers about the Cameon products. In other words... Well, I would just say I think Lexmark stands for a broader proposition. It's just that judges should not engraft prudential standing requirements not enacted by Congress. And so by saying you need your own mark, it seems like Judge Due is requiring a prudential standing requirement that Congress didn't enact. I think Judge Due was applying Starkist exactly because what the claim to harm was in Starkist was we are, the petitioner said we are already selling under the Rose Bowl name. And if you prevent us from, the reason they wanted cancellation of the competing mark was so that they could continue marketing under the Rose Bowl mark. Well, of course, those were the facts of Starkist, but that doesn't tell us that Lexmark is wrong when it says that the interest may be broader than injury to your own mark. Then what you're suggesting, Your Honor, I believe is that Lexmark overrules Starkist. No, I don't think so. Okay. All right. I'd like to return back to the settlement agreement. And Cameon has talked about trying to change the words of the settlement agreement and then bookend that with what they claim Judge Baldwin held at the end of the bench trial. And they keep talking about this blanket ban. Cameon cannot use Metalast in any fashion or manner whatsoever, which is technically what the settlement agreement said. But what the judgment said, the order for specific performance only limits the appellants from using Metalast on product labels, advertising, sales orders, invoices, purchase orders, technical data sheets, safety data sheets, Web pages, brochures, or other documents of commerce. So when you get into the discussion about whether Cameon can refer to its own history, if Cameon goes out to investors or goes to a bank, Cameon can certainly say, well, this is how we acquired the assets of Metalast International LLC. Cameon is free in a radio interview, I guess, to say this is how our company came about. Cameon is free to go sit with its major clients and say, this is how we got into this business. This is how we are selling these products now. It's simply that Cameon can't say, here's a labeled product. This is formally Metalast on it. Here's a safety data sheet. This is formally Metalast on it. I think most of that makes sense except for maybe the safety sheet. It does make some sense that if you're trying to describe what this chemical is to show its history, so why couldn't you put that at least on a safety sheet? Well, first of all, the argument from Cameon was always that it was required by the regulation, by 29 CFR 1910.1200, it was required to say formally Metalast. And yet its own conduct was completely the opposite of that. And let me explain that. Cameon doesn't make its own chemicals. Cameon buys chemicals from other parties, repackages them, and then sells them into the market. And there's basically three big categories of product that Cameon sells. One is a patent product, and that's the TCP licensed from the United States Navy. Second is a series of deoxifiers, dyes, those types of things. It buys from a source, repackages those, sends them out. The third is AA200, which is a product that is well known in the market, but just not for the use that Cameon sells it. In its own safety data sheets, Cameon doesn't identify those manufacturers and doesn't tell the people looking at the sheet that this is the identical chemical that you can buy from this manufacturer under this name. So the idea that it has to say formally Metalast for safety reasons is just belied by its own conduct. And while I'm talking about the patent issue, there were statements by counsel at this podium that David Simas went out and told the market that he had the right to sell the patented chemicals. That is not the case at all. That's not in the record anywhere. In fact, David Simas wrote an email to Mr. and Mrs. Meiling that said, there are at least two or three other licensees under that Navy patent. Now they can come and buy the Metalast name, and they can start selling this chemical. But David Simas never threatened to go into that business himself, ever. So that was just an error on counsel's part. The notion that Steppenwolf requires a different result from this trial is incorrect, and nobody in the room knows the Steppenwolf decision better than Judge Fletcher. But that decision has two main analyses. That decision does not conflate trademark with contract law. Steppenwolf in Part 1A is a contract analysis. Steppenwolf in Part 1B is the trademark analysis. Now my client initially had a counterclaim for trademark infringement, and we dismissed that counterclaim early on in the case. So we were only talking about the contract claim from that point. Steppenwolf applies California law as it should because that was a California contract. The contract, the settlement agreement in this case, is a Nevada contract bound by Nevada law. The California law includes California Civil Code Sections 1647 and 1648, and that's what was applied in the Steppenwolf case. And those code sections basically say if there's broad contract language, we are going to look closely at what the parties actually intended, and that exploration can be informed by the subject matter of the contract. Those concepts are not to be found anywhere in Nevada jurisprudence. That's strictly California analysis. And so it would be error, and honestly I believe that this district court erred by applying Steppenwolf at all in our case. Obviously we did not appeal. We are satisfied with the judgment of the case. But technically we think it's error to apply Steppenwolf to this case. I see my time is up. If the court has any more questions for me, I'd be happy to take a shot. Thank you, Counsel. Thank you. It's nice to end on a tough question like the one I did about whether the parties could negotiate because then I had a few minutes to think of an appropriate response, and the answer is really Steppenwolf. In Steppenwolf, the parties could have negotiated to use the term formerly Steppenwolf or formerly of Steppenwolf. They didn't. But the court still found that even under a contract that is virtually identical where it says you can't use the word Steppenwolf in any way whatsoever, they still did not give that a literal interpretation and to find that it prevented the use of the phrase formerly Steppenwolf. Well, what happened here is the court didn't give it a literal interpretation either. So we disagree and we think it was a literal interpretation. Well, but no. The court has qualified it and it says in commerce. So it does qualify. That's a qualification to the absolute language of the settlement contract. And right before the language that was stated, it says that the court held that Kimeon can't use the word Medelast  But in commerce is a qualification of the absolute language of the agreement. That's correct, but that comes from where? That's rewriting the party's agreement. It comes from the same sort of analysis that we used in Steppenwolf, that is to say interpreting the language in context. And the question is what does that mean? Are the parties negotiating to not use this in commerce because the examples that the opposing counsel gave of representing the history of the company could all be considered in commerce? And the question is what's an example of Kimeon doing something that's not in commerce? It's only a business. Everything that it does has a relationship and an interface with the marketplace. So we don't believe that that grafting of the phrase in commerce complies with Steppenwolf because Steppenwolf talked about customer confusion. And unless you get to that customer confusion aspect, the phrase in commerce is meaningless and doesn't graft on trademark principles onto this particular settlement agreement. But importantly, that's not what Chief Judge Stu held when she kind of decided the law of the case when she said it would lead to an absurd interpretation if you interpreted it literally and provided it with a universal interpretation. And I do want to specifically just mention one additional thing about the literal interpretation here, is that grafting on the phrase in commerce does not add anything to the scope of the injunction. It still protects safety data sheets. It still covers all the other aspects, basically everything in the case that Kimeon was accused of doing with regard to Medelast and all of the potential uses that were discussed would still be banned by that overbroad injunction. And the last argument, Your Honor, is that we also think that there was a clear error by the district court in refusing to permit Kimeon to proceed with its claims under the submarks, requiring that those submarks be used in actual commerce. And we do think the briefing is strong on this point with respect to their threatened use in commerce. Thank you very much. Thank you, counsel. We are adjourned until tomorrow. All rise.
judges: FLETCHER, BUMATAY, Kane